**STATE**

v.

**Jeffrey R. HOLMES.**

**No. 97–74–C.A.**

Supreme Court of Rhode Island.

July 15, 1998.

Annie Goldberg, Aaron L. Weisman, Providence, for plaintiff.

Christopher P. Corbett;  Donna A. Uhlmann, Cranston, for defendant.

Before WEISBERGER, C.J., and LEDERBERG, BOURCIER, FLANDERS and GOLDBERG, JJ.

## OPINION

BOURCIER, Justice.

This case comes before us on the defendant's appeal from final judgments of conviction following a jury trial in the Kent County Superior Court on two counts of second-degree child-molestation sexual assault.

### I

#### Facts and Travel

In October 1992 Richard, then thirteen years old, was attending the Briggs School in the Buttonwoods area of Warwick. One of his schoolmate friends was sixteen-year-old James.[1] According to Richard's testimony, one day after finishing his job landscaping for a neighbor, he was met by James and the two entered a blue El Camino driven by an older man whom James had described to Richard as a "friend." James, however, did not introduce Richard to the older driver, and the man told Richard that he couldn't reveal his name until he knew Richard a little better. Once both Richard and James had entered the El Camino, the older man took them for a ride through Warwick.

As the three traveled through Warwick toward the Rocky Point Park area In the El Camino, the older man told Richard that he would pay him various amounts of money if Richard would perform certain sexual acts. The older man then began to rub Richard's leg and then his penis. Eventually the three

---

1. Both Richard and James are fictitious names.

arrived at Rocky Point Park, at which time James exited the El Camino, leaving the unidentified older man alone with Richard. The older man then drove around the Rocky Point Park area and masturbated while Richard sat in the passenger seat. The car trip lasted approximately ten minutes, after which the two returned to Rocky Point Park where James rejoined Richard and the older man. Upon reentering the El Camino, James sat between Richard and the unidentified older man, who then started rubbing James' penis and continued to do so for ten to fifteen minutes. Finally, the older man drove the two boys to the end of Richard's street and gave Richard $10 or $15 in exchange "for sexual favor." Richard told no one of this incident.

Several days later Richard encountered the unidentified older man again, this time at the Jennie's Ice Cream store located in Warwick. The older man approached Richard and offered him a ride home from the ice cream store. Richard unwisely accepted the invitation, and once again the two drove to the Rocky Point Park. While driving his El Camino in the Rocky Point Park neighborhood, the older man unbuttoned Richard's pants and touched his penis. Further, the man lowered his own pants and forced Richard to touch his penis. Upon leaving the Rocky Point Park area, the man proceeded to Cumberland Farms and, leaving Richard in the car, entered the store in order to "get some money." Upon returning to the car, the man paid Richard $35 and then, once again, drove him to the end of the street where Richard lived and dropped him off. Once again, Richard kept knowledge of his encounter with the older man in the El Camino a secret.

A "little while" later, around December of 1992, Richard was "hanging around" the same Cumberland Farms store located in Warwick when he encountered the unidenti-fied older man again. Yet again Richard accepted a ride from the older man. For a third time, the two drove toward Rocky Point Park. This time, however, Richard became frightened, and when the older man made a routine traffic stop, Richard hastily jumped from the blue El Camino and ran home.

The following day in school Richard related his encounters with the unidentified older man to one of his teachers. Richard still did not know the older man's name, but he was able to accurately describe the blue El Camino that the older man drove. Richard's story prompted a visit to the Warwick police department where he gave a statement to the police describing the three incidents previously related. Thereafter, one Jeffrey R. Holmes (defendant) was arrested and charged by information with three counts of second-degree child-molestation sexual assault in violation of G.L.1956 § 11–37–8.3.[2]

Prior to trial the defendant moved in limine for the issuance of a subpoena duces tecum pursuant to Rule 17(c) of the Superior Court Rules of Criminal Procedure in order to produce any Department of Children, Youth and Families (DCYF) files relating to Richard. These files are, subject to exception, confidential and not readily susceptible to discovery.[3] The defendant had sought to inspect Richard's DCYF file in order to learn whether the complaining victim had in the past made unfounded accusations of sexual assault against either the defendant or others. Presumably the requested information could then be employed by the defendant to impeach the credibility of Richard's expected trial testimony. In response to the defendant's motion in limine, the trial justice diligently performed an in camera inspection of Richard's DCYF records in order to determine if any were relevant with regard to the defendant's request. Following this inspection, on January 17, 1995, the trial justice

---

**2.** General Laws 1956 § 11–37–8.3, entitled "Definition of guilt of second degree child molestation sexual assault," provides that "[a] person is guilty of a second degree child molestation sexual assault if he or she engages in sexual contact with another person fourteen (14) years of age or under."

**3.** General Laws 1956 § 42–72–8, entitled "Confidentiality of records," provides in pertinent part that "(a) Any records of the department pertaining to children and their families in need of service pursuant to the provisions of this chapter or for whom an application for services has been made shall be confidential and only disclosed as provided by law."

announced his decision from the bench stating:

> "The Court reviewed these records * * *. There is absolutely no indication in these records that this young man ever made a complaint against anybody for improper sexual touches or advances of any kind, and this was the only reason why I took the records to look at them."

Accordingly, as the trial justice found that Richard's DCYF records were not relevant to the defense's case, he ruled that they not be turned over to defense counsel. At that time the trial justice further denied the defendant's unopposed motion to include the sealed DCYF records in the court case record.

The defendant's jury trial commenced on January 17, 1996, and concluded on January 26, 1996. During the trial the state's chief witness was Richard, now sixteen years of age. After Richard related his account of the alleged incidents of sexual molestation to the jury, defense counsel then proceeded to extensively cross-examine him. During that cross-examination, defense counsel was afforded wide latitude by the trial justice and permitted to explore each detail of Richard's account of the events surrounding each of his meetings with the defendant. The bulk of the cross-examination centered about and dealt with the accuracy of Richard's original statement given to the police and, as is usual in numerous sexual molestation cases, the complaining witness's decision to keep the alleged incidents of assault secret.

Following the close of the trial evidence, the defendant moved for a judgment of acquittal as to all three counts. His motion for judgment of acquittal was granted only as to the count alleging child molestation for the incident in which Richard jumped out of the defendant's car and ran home before any assault occurred. The motion as it pertained to the remaining two counts was denied. Thereafter the jury returned verdicts of guilty on each of the remaining two counts of second-degree child-molestation sexual assault. The defendant was subsequently sentenced to consecutive thirty-year sentences, the second being suspended. The defendant now appeals.

In his appeal the defendant contends that the trial justice erred in denying his motion for the issuance of a subpoena duces tecum for Richard's DCYF records and as well in denying his motion to include a sealed copy of the sought after records in this case record. We reject the defendant's appeal and affirm his conviction.

## II

### Analysis

The defendant contends that his right to confrontation secured by both the Sixth Amendment to the United States Constitution and article 1, section 10, of the Rhode Island Constitution was violated by the trial justice's denial of his motion seeking a subpoena duces tecum for Richard's DCYF records. Since the United States Supreme Court's opinion in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), we have recognized that a defendant's right to confrontation is a constitutionally compelled trial right. *State v. Myers,* 115 R.I. 583, 350 A.2d 611 (1976). That right, however, is not absolute, *State v. Parillo,* 480 A.2d 1349, 1355 (R.I.1984), and may be restricted in order to protect confidential information. In the case now before us, the defendant asserts that his constitutional right to confront his accuser, Richard, was impermissibly abrogated by the trial justice's refusal to allow him access to Richard's DCYF files. These files, however, are, subject to exception, confidential because the General Assembly, in enacting § 42–72–8, "intended to protect the privacy interests of parties receiving services from the department." *Mallette v. Children's Friend and Service,* 661 A.2d 74, 76 (R.I.1995). The defendant nevertheless contends that his right to confront Richard in court transcends this privacy interest and, further, that the trial justice's in camera inspection of Richard's DCYF records did not adequately protect this right of confrontation.

We have previously addressed the same argument raised here by the defendant in *State v. Kholi,* 672 A.2d 429 (R.I.1996). In *Kholi* a criminal defendant, charged, inter alia, with multiple counts of first-degree sex-

ual assault against his stepdaughter Amy,[4] had sought access to certain doctor's notes made during Amy's psychotherapy sessions. "Pursuant to defendant's request, the trial justice reviewed the notes in camera for relevancy and determined that they were not material to the instant case." *Id.* at 436. At trial, following Amy's testimony, the defendant in *Kholi* reasserted his request for the doctor's psychotherapy session notes, claiming that they were necessary in order to effectively cross-examine the witness. Again the trial justice denied the defendant's request because, based upon the trial justice's in camera review of the doctor's notes, those notes were found to be both consistent with Amy's testimony and not relevant to her credibility. Finally, the defendant requested to be furnished any portion of the doctor's notes that would bear on the veracity of Amy's testimony that she had attempted suicide because of the abuse perpetrated by the defendant. In response to this request the trial justice conducted a second in camera inspection of the notes and determined that some four pages were relevant to the defendant's request, and accordingly these pages were made available to the defendant. *Id.* At the end of the trial, the defendant in *Kholi* was convicted of ten counts of first-degree sexual assault. The defendant appealed those convictions, claiming, inter alia, that he was entitled to all of the doctor's notes that he had requested.

In addressing the defendant's assertion that he was entitled to all of the doctor's notes he had requested, we noted that a request for confidential information creates a tension between a criminal defendant's right to effectively cross-examine witnesses and the public's interest in securing the confidentiality of certain types of information. *Id.* at 436–37. In the case now before this Court we are confronted by that same tension, and once again we adopt the solution we enunciated in *Kholi*, wherein we stated that "the trial justice's in camera review of the privileged information struck the requisite balance between defendant's constitutional right to effective cross-examination and Amy's right to confidentiality." *Id.* at 437; *see also*

State *v. Brown*, 709 A.2d 465, 470 (R.I.1998) (endorsing in camera inspection where confrontation right timely raised).

The defendant, in support of his appeal, commends to us the case of *State v. Kelly*, 554 A.2d 632 (R.I.1989). In *Kelly* a defendant charged with first-degree sexual assault had sought the production of DCYF records pertaining to the complaining witness, but the requested records were not provided to the defendant, nor were they ever even inspected by the trial justice in order to determine their possible usefulness to the defendant. This Court found that the defendant in *Kelly* had a right "to use as much of this witness's DCF records as might reflect adversely upon her credibility." *Id.* at 636. In addressing the proper remedy for the violation of the defendant's right to confront his accuser, this Court stated:

> "The remedy in this situation depends entirely on the nature of the records excluded. For this reason, if this were the only issue involved, this case would be remanded to the Superior Court with instructions that the court produce and review in camera all records maintained by DCF regarding this witness. If the court found that those records would create a basis for an attack on this witness's credibility, defendant would be granted a new trial. If the records from DCF did not reveal any information that adversely reflected on this witness's credibility, the judgment of conviction would be affirmed." *Id.*

The case now before us is readily distinguishable from *Kelly*. In *Kelly* the defendant's appeal succeeded for the sole reason that the trial judge never took occasion to inspect the sought after DCYF records in order to determine their impact upon the defendant's right to confront the complaining witness at trial. As a result this Court found that a remand was appropriate so that a trial judge could then conduct an in camera inspection in order to decide the impact of the requested records upon the defendant's right to confront and effectively cross-examine the complaining witness. *Cf. Brown*, 709 A.2d at 470 (remand for in camera inspection not proper remedy when defendant failed to raise confrontation right issue with trial justice). In this case, unlike *Kelly*, the trial justice did conduct the necessary in camera

---

4. Amy is a fictitious name.

inspection of the sought after DCYF records and concluded that they contained no relevant materials the absence of which would infringe upon the defendant's right to cross-examine the complaining witness. Accordingly, the remand order that we deemed appropriate in *Kelly* is uncalled for in the instant case.

We note further that one of the United States Supreme Court's leading case holdings on a defendant's pretrial right to confidential records, *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987), is consistent with our decision today. In *Ritchie* a criminal defendant charged with multiple crimes for sexually molesting his thirteen-year-old daughter had sought access to the young girl's Children and Youth Services (CYS) files. The trial judge refused this request despite never having reviewed the files in camera. On appeal the Pennsylvania Superior Court remanded the case to the trial judge with direction "to examine the confidential material *in camera*, and release only the verbatim statements made by the daughter to the CYS counselor." *Id.* at 45, 107 S.Ct. at 995, 94 L.Ed.2d at 50 (citing *Commonwealth v. Ritchie*, 324 Pa.Super. 557, 472 A.2d 220, 226 (1984)).

The Pennsylvania Supreme Court later expanded upon the Superior Court's ruling and found that the defendant's counsel was entitled to search through the daughter's entire CYS file in order to determine what information might be useful to the defendant's cause. The Pennsylvania Supreme Court noted that a trial judge's in camera review of the files was insufficient as it "den[ies] the opportunity to have the files reviewed with the eyes and perspective of an advocate." *Commonwealth v. Ritchie*, 509 Pa. 357, 502 A.2d 148, 153 (1985).

The United States Supreme Court granted certiorari and thereafter reversed the Pennsylvania Supreme Court, finding that the defendant's right to material evidence did "not include the unsupervised authority to search through the Commonwealth's files." *Ritchie*, 480 U.S. at 59, 107 S.Ct. at 1002, 94 L.Ed.2d at 58. Instead the United States Supreme

Court found that "Ritchie's interest (as well as that of the Commonwealth) in ensuring a fair trial can be protected fully by requiring that the CYS files be submitted only to the trial court for *in camera* review." *Id.* at 60, 107 S.Ct. at 1002–03, 94 L.Ed.2d at 59. "An *in camera* review by the trial court will serve Ritchie's interest without destroying the Commonwealth's need to protect the confidentiality of those involved in child-abuse investigations." *Id.* at 61, 107 S.Ct. at 1003, 94 L.Ed.2d at 60.

We found agreement with the United States Supreme Court on this point in *Kholi*, and we reiterate that agreement today in rejecting the defendant's appeal. The in camera inspection of Richard's DCYF records performed by the trial justice in this case both adequately protected the defendant's right to a fair trial and properly furthered Richard's and the state's interest in shielding confidential information from unnecessary and potentially embarrassing public scrutiny.

For the foregoing reasons the defendant's appeal is denied and dismissed. The judgments of conviction are affirmed, and the papers in this case are remanded to the Superior Court.